IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EARLY T. VELAZQUEZ,          :
         Plaintiff         :
                         :
    vs.                   :    CIVIL NO. 1:CV-14-0866
                         :
ES3 YORK LLC,            :    (Judge Caldwell)
         Defendant    :
                         :
                         :

*M E M O R A N D U M*

## I.   *Introduction*

Plaintiff, Early T. Velazquez, filed this suit against defendant, ES3 York LLC, his former employer, after Defendant terminated him in October 2012 from his job as an incentive selector.  He makes the following three federal claims: (1) Defendant fired him in violation of the Americans with Disabilities Act (ADA), *see* 42 U.S.C.A. § 12112(a); (2) Defendant failed to accommodate his disability in violation of the ADA, *see* 42 U.S.C.A. § 12112(b)(5); and (3) Defendant retaliated against Plaintiff for requesting accommodations under the ADA, *see* 42 U.S.C.A. § 12203.  He makes two state-law claims: (1) Defendant's actions violated the Pennsylvania Human Relations Act (PHRA), *see* Pa. Stat. Ann. § 951 et seq.; and (2) Defendant fired him to prevent him from making a worker's compensation claim in violation of Pennsylvania common law.

Defendant has filed a motion for summary judgment on all claims, principally asserting that they lack merit because Plaintiff was terminated for taking an unauthorized break while on the clock, not for any disability he had.

II.   *Standard of Review*

Fed. R. Civ. P. 56 governs the grant of summary judgment.  The moving party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a). "'Material facts are those that could affect the outcome of the proceeding, and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party.'"  *Roth v. Norfalco LLC*, 651 F.3d 367, 373 (3d Cir. 2011)(quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011))(internal quotation marks omitted).

In pertinent part, parties moving for, or opposing, summary judgment must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "The non-moving party cannot rest on mere pleadings or allegations," *El v. Southeastern Pennsylvania Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial."  *Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).  We "must view all evidence and draw all inferences in the light most favorable to the non-moving party" and we will only grant the motion "if no reasonable juror could find for the non-movant."  *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

With this standard in mind, we set forth the background to this litigation. We will sometimes borrow the parties' language as it appears in the statement of material facts and counter-statement of material facts.

III.   *Background*

We will follow Defendant's Statement of Undisputed Material Facts (Doc. 32, DSMF ¶) in setting forth the background, but bearing in mind we must accept the evidence in the light most favorable to Plaintiff, we will note where Plaintiff disagrees with Defendant's presentation of the facts.

A.   *ES3's Business and the TAD Program*

ES3 provides wholesale storage and food distribution services to grocery manufacturers and stores throughout the United States.  It operates a warehousing and distribution facility in York, Pennsylvania.  (Doc. 32, DSMF ¶ ¶¶ 1-2, admitted by Plaintiff).

In October 2012, ES3 employed approximately 342 incentive selectors in its York facility.  Incentive selectors pick cases of dry goods and shelf-stable products to fulfill grocery store orders.  They assemble the cases onto pallets to be shipped to grocery store customers.  Incentive selectors are eligible for extra pay if they exceed ES3's minimum productivity expectations.  The position is a physically intense job.  (*Id.*, DSMF ¶ ¶¶ 3-6, admitted by Plaintiff).

ES3 offers a light-duty program called Temporary Alternate Duty ("TAD") for employees (including incentive selectors) who have been injured at work and who

temporarily cannot fulfill their normal job duties.  The TAD program is voluntary.
Employees in the TAD program are assigned duties within the medical restrictions
established by their physicians.  If an employee's physician allows, part of the TAD
program involves slowly returning the employee to his original duties to gradually re-
acclimate him and avoid re-injury.  Once an employee's physician confirms that he may
return to his regular job, the employee is taken out of the TAD program and resumes his
normal duties.  (*Id.*, DSMF ¶ ¶¶ 7-11, admitted by Plaintiff).

During a TAD assignment, an employee is given two paid fifteen-minute
rest breaks and one unpaid thirty-minute lunch period.  (*Id.*, DSMF ¶ ¶ 12, admitted by
Plaintiff).  A fifteen-minute break cannot be taken back to back with the lunch break.  (*Id.*
DSMF ¶ ¶ 13, admitted by Plaintiff).  According to Defendant, except during their
scheduled rest breaks and lunch period, employees on a TAD assignment are expected
to be working during all times in which that employee is clocked in.  (*Id.*, DSMF ¶ ¶ 15,
citing Doc. 32-2, Lindsley Decl. ¶ 7).

During Velazquez's employment, TAD employees had to record the actual
times of their rest breaks and lunch periods on a form entitled "Light Duty Tracker."  (*Id.*,
¶ 14, admitted by Plaintiff).  Review of the Light Duty Tracker submitted for the day
Plaintiff was fired indicates the form has spaces available to note each light-duty
employee working that shift, the time the employee began the shift, the times the
employee began and ended his first rest break, the times he began and ended his lunch

period, the times he began and ended his second rest break, and the time he ended his shift.  (Doc. 32-5, ECF p. 2, Def.'s Ex. K, Light Duty Tracker).

According to Plaintiff, the light-duty employee is also entitled to additional breaks he might need because of his work-related injury as long as he notifies his supervisor.  He supports this assertion with the testimony of Stephen Lindsley, one of Defendant's operations managers, and the testimony of Kristin Morris, Defendant's human resources supervisor.  Both testified at a worker's compensation hearing. Lindsley testified that, in addition to the two rest breaks and the lunch period, a light-duty employee could take a short break because of his work-related injury if the worker came to "them" ahead of time (if he had the ability to do so) and also gave them some explanation of what was going on.  (Doc. 36-23, ECF pp. 4-5, cited in Pl.'s counter-statement of material facts (CSMF ¶ 102).  Morris testified that there would be no problem with the employee taking periodic breaks because of his work-related injury as long as he notified his supervisor, and if there were a bathroom emergency, he could tell the supervisor afterward.  (*Id.*, ECF pp. 6-7).

Incentive selectors use a "Downtime Sheet" to account for any time not selecting.  Employees are required to log time spent not working as precisely as possible. Employees in the TAD program are also required to complete a Downtime Sheet daily. (Doc. 32, Def.'s SMF ¶¶ 18-20, admitted by Plaintiff).  Employees must present their Downtime Sheets to their supervisors for approval if their downtime reaches fifteen minutes or more.  (*Id.*, ¶ 21, citing Doc. 32-2, Lindsley Decl. ¶ 10).  Review of Plaintiff's

Downtime Sheet for the day he was fired indicates that the sheet requires the employee to list the time the downtime started, the reason for the downtime, the length of the downtime in minutes, and that he obtained a supervisor's approval for the downtime. (Doc. 32-5, Def.'s Ex. M, lower third of the document).  According to Plaintiff, if a selector is not selecting, he uses the Downtime Sheet to record why he is not selecting.  (Doc. 36-1, Velazquez Dep., ECF p. 49).

B.  *Plaintiff's Employment History and TAD Assignments*

Velazquez began working for ES3 in York on August 16, 2010.  After an initial period of training, Velazquez worked as an incentive selector.  In October 2010, while he was working as an incentive selector, Velazquez injured his back while assisting a coworker.  He reported this injury to ES3 and received medical treatment for bulging discs.  (Doc. 32, DSMF ¶ ¶¶ 22-25, admitted by Plaintiff).

After Velazquez's October 2010 injury, he participated in the TAD program from October 13, 2010, through February 6, 2011.  Velazquez makes no complaint about his treatment during this light duty assignment; in fact, he admits he was treated "fairly." (*Id.*, ¶¶ 26-27, admitted by Plaintiff).

On April 30, 2012, one of ES3's supervisors noticed that Velazquez had taken a prolonged break while clocked in.  During this break, Velazquez was on the telephone with his wife for a "long" time resolving a domestic dispute.  According to his deposition testimony, Velazquez understood that he had violated ES3 policies because

he had taken this extended break without permission and while clocked in.  (*Id.*, ¶¶ 28-30, admitted by Plaintiff).

ES3 issued an Employee Counseling Record after this incident that reflects that "Early was found outside handling a domestic issue for over 2 hours while still on the clock."  (*Id.*, ¶ 31, admitted by Plaintiff; Doc. 32-4, ECF p. 5, Def.'s Ex. E, Employee Counseling Record dated May 2, 2012).  The Counseling Record also states that "any future issues of this nature will result in immediate discipline upto [sic] and including termination."  (*Id.*, ¶ 33; Doc. 32-4, ECF p. 5, Def.'s Ex. E).  As a result of this incident, Velazquez served a three-day suspension.  (Doc. 32, DSMF ¶ ¶ 32, admitted by Plaintiff). Velazquez signed and received the Employee Counseling Record.  After that disciplinary notice, Velazquez understood that any future similar issues could result in discipline, including possible termination.  (*Id.*, ¶¶ 34-35, admitted by Plaintiff).

On July 15, 2012, Velazquez reinjured his back while lifting a case of Clorox bleach.  Velazquez reported this incident to his supervisor and filed a claim for worker's compensation.  After his July 2012 injury, Velazquez voluntarily entered the light-duty program.[1]  ES3 initially assigned Velazquez to work 8:00 a.m. to 4:30 p.m., Monday through Friday.  Beginning in August 2012, ES3 moved Velazquez and all of the other employees in the TAD program (who, up until that point, had been working on

_____

[1]  As noted above, also known as the TAD program, for "temporary alternate duty."

various shifts) to a single shift: 7:00 p.m. to 3:30 a.m., Thursday through Monday.  ES3 did this so that the TAD associates could be more easily supervised.  (*Id.*, ¶¶ 36-41, admitted by Plaintiff).

While in the TAD program, Velazquez performed a variety of tasks, including assisting the sanitation department, pushing a broom in the aisles, pulling plastic wrap off cardboard rolls for recycling, and working in the overs, shorts, and damages ("OS&D") department.  (*Id.*, ¶ 43, admitted by Plaintiff).  Plaintiff testified at his deposition that all of these tasks were within Plaintiff's medical restrictions.  (*Id.*, ¶ 44, citing Doc. 36-1. ECF p. 43).[2]

After every visit with his physician, Velazquez submitted to ES3 documentation of his visits and, if applicable, updated restrictions.  Velazquez turned in this paperwork to Kody Taylor, an operations supervisor, unless Taylor was not at work that day.  Velazquez never received a doctor's note that he did not provide to ES3, and

---

[2]   Plaintiff disagrees that these tasks were within his medical restrictions, contending that after he was examined by Defendant's medical provider, restrictions were placed on him, limiting his lifting, stooping, bending, rotating, twisting and squatting.  He specifically mentions sweeping as an activity that was within his restrictions.  Doc. 36, Pl.'s response to DSMF ¶ ¶ 44).  The material evidence he cites in support are the Work First medical records.  Doc. 36-7, Pl.'s Ex. G, ECF pp. 1-11).  (Work First provided medical care to employees, like Plaintiff, who are injured on the job at ES3.)  These records indicate that restrictions started immediately after the injury with no repetitive bending or twisting and then were loosened to occasional rotation and twisting.  *Id.*, ECF pp. 8-9.  We therefore disagree with Plaintiff and will accept Plaintiff's deposition testimony concerning the nature of the activities he could perform.  Parenthetically, we note that the July 15 restrictions stated that Plaintiff was to be allowed to "change positions as needed" and the July 16 restrictions "allow[ed] frequent position changes."  (Doc. 36-7, ECF p. 9).

ES3's log of Velazquez's restrictions accurately reflects the doctor's notes he submitted. (Doc. 32, Def.'s SMF ¶¶ 45-47, admitted by Plaintiff).

Plaintiff contends Taylor treated him and the other light-duty workers poorly. According to Defendant, Plaintiff testified that Taylor treated him poorly in only four ways. First, Taylor once requested that Velazquez stop working in OS&D and push a broom down certain aisles. (*Id.*, DSMF ¶ ¶ 48). Second, on his second day of transitional work,[3] which began at 7:00 p.m. on October 12, 2012, Taylor requested that Velazquez select for the first half of his shift and perform light-duty tasks for the second half. (*Id.*, DSMF ¶ ¶ 59). Third, Taylor confronted him one day because Plaintiff had taken a break without signing out for it on the Light Duty Tracker even though there was no pencil with which to sign out. Nonetheless, Taylor told him if he failed to sign out again, he would be suspended and possibly terminated. Fourth, one time Taylor walked by Velazquez while Velazquez was sitting at a computer terminal within OS&D. Taylor commented that "every time he looks over there, [Velazquez is] sitting." (*Id.*, DSMF ¶ ¶¶ 49-51, and Plaintiff's responses thereto).

According to Plaintiff, these were not the only ways Taylor treated him poorly; rather, Taylor "repeatedly belittled and threatened" him and "ordered him to perform duties that he told Taylor he could not physically perform . . . ." (Doc. 36, Pl.'s Response to DSMF ¶, ¶¶ 48-51).[4] Velazquez testified that no other supervisor treated

---

[3] As noted below, a transitional-work day was half selecting and half working in OS&D.

[4] We note that Plaintiff's Response cites to his CSMF ¶¶ 74-77, but that the record cited in these paragraphs does not support Plaintiff's contention.

him inappropriately during his employment with ES3.  (Doc. 32, DSMF ¶ ¶ 52, admitted by Plaintiff).

## C. *Plaintiff Begins to Transition to His Regular Duties*

On October 2, 2012, Velazquez's physician examined Velazquez and cleared him to start performing his normal duties with no limitations, beginning on October 21, 2012.  In the meantime, he was cleared for work with certain limitations.  (*Id.*, DSMF ¶ ¶ 53; Doc. 32-4, ECF p. 31, Def.'s Ex. I, Workers' Compensation Medical Status Report).  Under those limitations, Velazquez was permitted to "Occ[asionally] lift < 55 lbs.", "Occ[asionally] stop/bend", with "Occ[asional] rotation/twisting."  (Doc. 32, Def.'s SMF ¶ 54, admitted by Plaintiff; Doc. 32-4, ECF p. 39, Def.'s Ex. J, Injury and Illness Incident Report).  The medical status report also noted that in the week starting after the week of the examination, Plaintiff could spend the day in transition, "½ day picking[5] and ½ day 55 pound lifting restriction for two weeks."  (Doc. 32-4, ECF p. 31, Def.'s Ex. I).

These restrictions did not state that Velazquez needed "pain breaks" or that he should be entitled to any more breaks than ES3 typically gave its TAD associates. (Doc. 32, DSMF ¶ ¶ 55, citing Doc. 32-4, ECF p. 31, Def.'s Ex. I, the medical status report; Doc. 32-4, ECF p. 39, Def.'s Ex. J, Injury and Illness Incident Report; and Doc. 36-1, ECF p. 52, the Velazquez Dep.).  The restrictions also did not specify that Velazquez must perform the light-duty tasks during the first half of his shift and the selecting duties

---

[5] Meaning selecting.

during the second half of his shift (or vice versa).  (Doc. 32, DSMF ¶ ¶ 56, admitted by

Plaintiff).  According to Plaintiff, while pain breaks were not specified, he nonetheless

needed and requested periodic breaks to rest his back.  On more than one occasion he

told Taylor he needed such breaks.  (Doc. 36-1, ECF pp. 43, 44, 45, and 46, the

Velazquez Dep.; Doc. 36-28, ECF pp. 96, 97, and 41, Lee Yeager Dep.).

On his first day of transitional work, a split between selecting and light-duty

work, Velazquez performed light-duty tasks the first half of his shift.  Taylor then assigned

Velazquez to selecting duties for the second half of his shift.  (Doc. 32, DSMF ¶ ¶¶ 57-58,

admitted by Plaintiff).

On his second day of transitional work, which began at 7:00 p.m. on

October 12, 2012, Taylor requested that Velazquez select for the first half of his shift and

perform light-duty tasks for the second half.  (Doc. 32, DSMF ¶ ¶ 59, admitted by

Plaintiff).[6]  In response to this request, Velazquez told Taylor that he might need to take

additional pain breaks – breaks in addition to the two fifteen-minute breaks and one thirty-

minute lunch period ES3 provided - if Taylor insisted he select the first half of his shift.

He told Taylor his back was hurting from selecting the night before.  (*Id.*, DSMF ¶ ¶ 60,

admitted by Plaintiff).  Taylor did not give him a definitive answer one way or the other as

to whether his request for pain breaks would be granted, and instead did not respond to

Velazquez's request.  (*Id.*, DSMF ¶ ¶ 61, admitted by Plaintiff).  According to Plaintiff, he

---

[6]  The shift was scheduled to end on October 13, 2012, at 3:30 a.m.  (Doc. 36-1, ECF
p. 53, Velasquez Dep.).

needed and requested periodic breaks to rest his back, and as noted, he told Taylor on more than one occasion he needed such breaks.  (Doc. 36-1, ECF pp. 43, 44, 45, and 46, the Velazquez Dep.; Doc. 36-28, ECF pp. 96, 97, and 41, Lee Yeager Dep.).

Plaintiff did not tell anyone else of his need for additional pain breaks. (Doc. 32, DSMF ¶ ¶ 62, citing Doc. 36-1, ECF p. 43, Velazquez Dep.).  However, Plaintiff asserts he did tell Lindsley that he was on a pain break, at their meeting in the early morning of October 13, when, as described below, Lindsley told him he was being suspended, according to Plaintiff, for taking too many breaks.  (Doc. 36, Pl.'s CSMF ¶ 100, citing Doc. 36-22, ECF pp. 6-7, Velazquez testimony from the worker's compensation hearing transcript).

### D.  *Plaintiff's Suspension*

On October 12, 2012, between 7:00 p.m. and 10:45 p.m., and while Velazquez was assigned to selecting orders, Velazquez took four to five breaks, each lasting between 10 and 40 minutes, without clocking out.  (Doc. 32, DSMF ¶ ¶ 63, citing Doc. 36-1, ECF pp. 55-56, 62, and 64, Velazquez Dep.; (Doc. 32-5, ECF p. 2, Def.'s Ex. K, the Light Duty Tracker dated October 12, 2012; Doc. 32-5, ECF p.4, Def.'s Ex. L, the Red Prairie User Daily Detail Report By User for October 12, 2012, to October 13, 2012). According to Plaintiff, he recorded all of his breaks on his Downtime Sheet, what he also called the log sheet, (Doc. 36-1, ECF p. 56); he "documented each of [these breaks] as

best [he] could" on his Downtime Sheet for October 12, 2012 and was "almost positive [he] captured everyone one."  (Doc. 32, DSMF ¶ ¶ 65, admitted by Plaintiff).[7]

According to Velazquez, his back pain caused his stomach to hurt, which triggered bowel movements.  (*Id.*, DSMF ¶ ¶ 64, admitted by Plaintiff).  However, Velazquez wrote on his Downtime Sheet that he had a "stomache (sic) bug" and did not write anything about his back pain causing his stomach to hurt and in turn triggering bowel movements.  (*Id.*, DSMF ¶ ¶ 66, citing Doc. 32-5, Def.'s Ex. M, the Downtime Sheet; Doc. 36-1, ECF pp. 66-67, Velazquez Dep.).

After taking the four or five breaks of 10 to 40 minutes each, Velazquez then took another "pain break" of approximately 35 or 40 minutes, during which he used the bathroom.  (Doc. 32, DSMF ¶ ¶ 67, citing Doc. 36-1, ECF pp. 53, 56-57, Velazquez Dep.).[8]  During this time, he also went outside and purchased a hot dog from a lunch truck which was parked in ES3's parking lot.  (Doc. 32, DSMF ¶ ¶ 68, admitted by Plaintiff).  Lindsley saw Velazquez eating a hot dog as Lindsley entered the building around 23:30 that evening.[9]  (*Id.*, DSMF ¶ ¶ 69, admitted by plaintiff; Doc. 36-15, ECF p. 53, Lindsley Dep.; Doc. 32-2, Lindsley Decl. ¶ 14.   Velazquez had not clocked out for lunch at this time and did not record these 35 to 40 minutes as break time on the Light

---

[7]  The Downtime Sheet was dated October 11, but this was a mistake as Plaintiff stated it was for October 12.  (Doc. 36-1, ECF p. 66, Velazquez Dep.).

[8]  Plaintiff denies that the breaks were ten to forty minutes long but cites no evidence to support this assertion.  The record shows that he testified that the breaks were ten to forty minutes long.

[9]  Defendant sometimes uses military time.

Duty Tracker.  (Doc. 32, DSMF ¶ ¶ 70, citing Doc. 32-5, ECF p.4, Def.'s Ex. L, the Red

Prairie User Daily Detail Report By User; Doc. 32-5, ECF p. 2, Def.'s Ex. K, Light Duty

Tracker).[10]

When Plaintiff came back inside, Taylor saw Velazquez and told Velazquez

he thought he was fraternizing when he should have been working.  (Doc. 32, DSMF ¶ ¶

71).  Plaintiff denied he was fraternizing and said that he was on pain break because his

back was hurting and showed Taylor his Downtime Sheet.  (Doc. 36-1, CSMF ¶ 96, citing

Doc. 36-1, ECF p. 53, 59, 67, and 96, Valezquez Dep.).

Taylor, along with another operations supervisor, Joshua McCoy ("McCoy"),

then met with Velazquez to discuss Velazquez's behavior.  (Doc. 32, DSMF ¶ ¶ 72, and

Plaintiff's response thereto).  Taylor issued Velazquez a final written warning.  (*Id.*, DSMF

¶ ¶ 73 and Plaintiff's response thereto).  The final written warning states that "Early was

found to be taking excessive breaks.  Early was found in the light duty sit down area

talking to other associates at 2330 and has not picked a case since 2246."  (*Id.*, DSMF ¶

¶ 74, admitted by Plaintiff; Doc. 32-5, ECF p. 11, Def.'s Ex. O, Employee Counseling

Record dated October 13, 2012).

Velazquez admitted that he was outside eating a hot dog and says that he

again explained to Taylor that he was taking a break because his back was hurting and

again showed Taylor his Downtime Sheet.  (Doc. 32, DSMF ¶ ¶ 75, admitted by

---

[10]  Plaintiff denies this allegation because he later recorded on his Downtime Sheet, at
the direction of Lindsley, a thirty-minute lunch period starting at 12:00 a.m.  (Doc. 32-5, ECF p.
6, Def.'s Ex. M).  However, the challenged allegation refers to the time Plaintiff spent not
working and which culminated in his purchase of a hot dog, a different time frame.

Plaintiff).[11]  Velazquez refused to sign the documentation created by Taylor.  (*Id.*, DSMF ¶ ¶ 76, admitted by Plaintiff).  Taylor instructed Velazquez to return to OS&D and begin his light-duty assignment.  (*Id.*, DSMF ¶ ¶ 77, admitted by Plaintiff).

Plaintiff went to OS&D.  (Doc. 36-1, ECF p. 53, Velazquez Dep.).  About fifteen minutes to an hour later, he decided to see Lindsley and discuss what happened. (*Id.*; see also Doc. 32, DSMF ¶ ¶ 78).  When he arrived at Lindsley's office, he saw Taylor and Lindsley in the middle of a conversation.  (Doc. 32, DSMF ¶ ¶ 79, admitted by Plaintiff).  Taylor was in the process of informing Lindsley that Velazquez had not been productive and had not done any work for an extended period of time.  (*Id.*, DSMF ¶ ¶ 80, admitted by Plaintiff).  Taylor explained to Lindsley that he had researched Velazquez's nonproductive time.  Taylor also told Lindsley that he had, on his own, drafted a "counseling" and had attempted to review it with Velazquez and McCoy.  (*Id.*, DSMF ¶ ¶¶ 81-82, admitted by Plaintiff).

Based on this information, and the fact that Lindsley had personally seen Velazquez eating a hot dog as Lindsley entered the building around 23:30 that evening, Lindsley felt there was enough reason to warrant him doing a "deeper dive" into the facts. Because Velazquez had not yet clocked out for lunch, Lindsley instructed Velazquez to take his formal lunch break so that Lindsley would have time to gather the relevant documents and investigate the allegations.  Velazquez clocked out for lunch on the Light

---

[11]  The record appears to be unclear as to how many times Plaintiff met with Taylor after Taylor decided Plaintiff had been fraternizing.  Defendant thinks there was only one meeting; Plaintiff thinks there were two.  (Doc. 36-1, ECF p. 68, Velazquez Dep.).  The discrepancy is immaterial.

Duty Tracker at 12:45 a.m. and on the Red Prairie Daily Detail Report at 12:48 a.m. on October 13, 2012.  Meanwhile, Lindsley asked Taylor to gather certain data and write up a summary of events.  (*Id.*, DSMF ¶ ¶¶ 83-86, admitted by Plaintiff).

As part of his investigation, Lindsley reviewed a report within the Company's computer system which showed that Velazquez had last selected a case of product at 22:46.  Additionally, Lindsley viewed video footage showing that Velazquez arrived at the lunch truck at 23:22 and stayed there until 23:32.  At that time, Velazquez saw Lindsley arriving at the facility, finished what he was eating, and entered the building.  (*Id.*, DSMF ¶ ¶¶ 88-89, admitted by Plaintiff).  After piecing together that Velazquez had done no work from 22:46 until at least 23:32, Lindsley reviewed Velazquez's Light Duty Tracker, clock punches, and Downtime Sheet to see if there was any justification for Velazquez's failure to work from 22:46 until at least 23:32.  (*Id.*, DSMF ¶ ¶ 90, admitted by Plaintiff).

A review of the Light Duty Tracker revealed that Plaintiff had noted a rest break from 10:13 p.m. (22:13) until 10:28 p.m. (22:28), a time period which did not overlap with Plaintiff's non-working time from 22:46 through 23:32.  (*Id.*, DSMF ¶ ¶ 91, citing Doc. 32-2, Lindsley Decl. ¶ 16).[12]  Lindsley also saw that Velazquez had not clocked out for his lunch break during this time.  (*Id.*, DSMF ¶ ¶ 92, citing Doc. 32-2, Lindsley Decl. ¶ 17).[13]

---

[12]  Plaintiff denies this fact but relies on evidence that is not material to the allegation.

[13]  Plaintiff denies this fact because he did take a lunch after being instructed to do so, but this evidence is not material to the allegation.  The allegation relates to the time frame of

Additionally, Plaintiff's Downtime Sheet for October 12  did not contain precise times as required, was never authorized by a supervisor, and reflected downtime for an unspecified period beginning at 11:15 p.m. (23:15) caused by an alleged dead battery on a pallet jack and Velazquez's presence in the bathroom.  (*Id.*, DSMF ¶ ¶ 93, citing Doc. 32-5, Def.'s Ex. M, Downtime Sheet).[14]  The Downtime Sheet made no mention of Plaintiff's trip to the lunch truck for a hot dog, even though Lindsley had seen him there.  (*Id.*, DSMF ¶ ¶ 94, citing Doc. 32-5, Def.'s Ex. M, Downtime Sheet; Doc. 36-15, ECF pp. 16-17, Lindsley Dep.).[15]  Lindsley noted that Velazquez had been suspended five months earlier (the April 2012 counseling record) for doing no work over an extended period of time while clocked in, and had been warned that further incidents of this type would result in more severe consequences up to and including termination.  (Doc. 36-15, ECF pp. 18, 20, Lindsley Dep.; Doc. 32-4, ECF p. 5, Def.'s Ex. E, Employee Counseling Record dated May 2, 2012).

After completing his investigation, Lindsley concluded that Velazquez had done no work between 22:46 until 23:32 [and] did not clock out for this time in violation of

---

22:46 through 23:32.

[14]  Plaintiff denies this fact by asserting that he recorded his breaks on his Downtime Sheet, specifically indicating that he took periodic breaks, including to use the bathroom and also noted on the sheet that he had "bathroom issues today."  We disagree.  A review of the Downtime Sheet reveals that there are no entries for pain breaks nor the length of time for each break.  There are three entries that mention the bathroom, but two do not specify the length of the break (and the third is combined with another reason for the downtime).  The sheet does note that Plaintiff had "bathroom issues" that day but attributes this to a "stomach[ ] bug," not to his back pain, as Plaintiff now alleges.

[15]  Plaintiff denies this allegation but relies on facts that are not material to it.

Company policies.  (Doc. 32, DSMF ¶ ¶ 96, citing 32-5, ECF p. 8, Def.'s Ex. N, Oct. 13, 2012, e-mail from Lindsley to Morris).[16]  According to Lindsley, he decided to suspend Velazquez pending termination because he had performed no work over an extended period of time while on the clock and being paid and because Velazquez had previously been disciplined for the exact same thing.  (Doc. 36-15, ECF p. 18, Lindsley Dep.).

When Velazquez returned from the lunch period he had been instructed to take, he reported back to Lindsley.  Lindsley reviewed with Velazquez the information he had uncovered and informed Velazquez that he was suspending Velazquez.  Lindsley informed Velazquez that ES3 would investigate and then contact him about his employment.  (Doc. 32, DSMF ¶ ¶ 98-99, admitted by Plaintiff).  According to Plaintiff, Lindsley suspended him for taking too many breaks.  (Doc. 36-1, ECF p. 53, Velazquez Dep.).  Plaintiff also testified that he had been suspended "until further investigation," (Doc. 36-1, ECF p. 61), not pending termination, as Lindsley stated.  Velazquez was escorted out of the facility.  (Doc. 32, DSMF ¶ ¶ 100, admitted by Plaintiff).

E. *Plaintiff's Discharge*

The night Lindsley suspended Velazquez, he forwarded a statement he drafted as well as a statement written by Taylor to Kristin Morris, ES3's Human Resources Supervisor.  (Doc. 32, DSMF ¶ ¶ 102, admitted by Plaintiff).  The statements are e-mails, one written by Taylor and sent to Lindsley on October 13, 2012, at 1:43 a.m.

---

[16]  Plaintiff denies this allegation but relies on facts that are not material to it, the nature of Taylor's participation in the investigation that led to Plaintiff's dismissal.

-18-

and the other written by Lindsley and sent to Morris on the same date at 2:59 a.m.  The

Taylor e-mail is an attachment to the Lindsley e-mail.  (Doc. 32-5, ECF pp. 8-9, Def.'s Ex.

N).

      In pertinent part, the Lindsley e-mail reads as follows:

      Please see the attached email from Kody Taylor.

      Upon further investigation and viewing the cameras, Early did
not perform any work from staging his pallet at 22:46 to 23:32
while on the clock.

      When I came into work tonight I saw Early at the door by the
lunch truck eating.  This was around 23:30.  I viewed the
cameras in the area which showed Early getting to the truck at
23:22, I passed the lunch truck coming into work at 23:32 and
Early saw me, finished what he was eating and entered the
building.

      Shortly after this is when Kody brought everything to my
attention.

      I have viewed his Lawson and he has some counselings, one
being for not working for a 2 hour time frame while being on
the clock on 4/30/12. . . .

      I decided to suspend him pending termination for the incident.
. . .

      I have placed the downtime sheet that Kody [alludes] to along
with the Light Duty sign in /out sheet which shows he also
took a break from 22:13 to 22:28 in a folder . . . in your bin.

(Doc. 32-5, ECF p. 8).

      In pertinent part, the Taylor e-mail reads as follows:

      At approx. 2330 I noticed Early was over at the area the sit
down only light duty associates are at . . . .  I approached and
asked why he was not selecting cases. . . . I then spoke to

> Charlie Hunt and asked if we can pull up information as to the last time Early selected a case.  Charlie ran a query and it was determined that the last time Early selected a case was at 2246 hours.  I then completed a Lawson counseling for excessive breaks.  Early has had prior counselings . . . . He refused to sign the counseling.

(Doc. 32-5, ECF p. 9).

On October 16, 2012, Morris requested that Lindsley give her additional documents.  Morris requested the report of Velazquez's non-productive time that Lindsley reviewed, a copy of the video, and a print out of Velazquez's punch times.  Lindsley forwarded to Morris the requested information, except for the video (due to technical difficulties).  (Doc. 32, DSMF ¶ ¶¶ 103-104, admitted by Plaintiff).

Morris and other managers meet weekly to review whether or not to terminate employees.  (*Id.*, DSMF ¶ ¶ 105).  On Wednesday, October 17, 2012, for approximately 20 to 30 minutes, Morris and William Schmidt, an operations manager for Velazquez's business unit, met to discuss whether to terminate Plaintiff's employment.  (*Id.*, DSMF ¶ ¶ 106, admitted by Plaintiff).[17]  Morris had not met Plaintiff, and Schmidt's

---

[17]  Plaintiff would add that evidence supplied by Defendant indicates that there is an inconsistency in Defendant's position as to who participated in the decision to terminate Plaintiff: at one point, Lindsley and Kelly Robinson, Morris's supervisor, also participated, (Doc. 36, CSMF ¶ 115, admitted by Defendant); at another, Lindsley denies being present when the decision was made (*id.*, CSMF ¶ 116, admitted by Defendant); at a third, Lindsley says Morris and Andy Kakos, the day-shift manager, made the decision, (Doc. 36, CSMF 117, citing Doc. 36-23, ECF pp. 2-3, worker's compensation transcript); at a fourth, Morris testified at Velazquez's worker's compensation hearing, that it was her, Andy Kakos, Stephen Lindsley and "possibly [the] first shift manager" who had the "collective thought" of terminating Plaintiff, (Doc. 36, CSMF ¶ 119, citing Doc. 36-23, ECF p. 8); at a fifth, even though Robinson is mentioned as participating, Robinson testified that he could not remember doing so.  (*Id.*, CSMF ¶ 120, citing Doc. 36-20, ECF p. 16, Robinson Dep.).

interactions with him were limited to saying "Hi" in passing.  (Doc. 32, DSMF ¶ ¶¶ 107-108, admitted by Plaintiff).  However, both of them knew that he was working on light duty, and Schmidt knew that he had suffered a work-related injury.  (Doc. 36, CSMF ¶ 112, admitted by Defendant).

In deciding to terminate Velazquez's employment, Morris and Schmidt reviewed the documents that Lindsley provided, including Velazquez's prior discipline for theft of time, statements drafted by Lindsley and Taylor, the light duty log, Velazquez's Downtime Sheet, Velazquez's clock out punches, and a screen shot of Velazquez's selection history for October 12, 2012.  (Doc. 32, DSMF ¶ ¶ 109, citing Doc. 32-5, ECF pp. 25-26, 27, Morris Dep.; Doc. 32-5, ECF pp. 41, 43, Schmidt Dep.; Doc. 32-4, Def.'s Ex. E; Doc. 32-5, ECF p. 2, Def.'s Ex. K; Doc. 32-5, ECF p. 4, Def.'s Ex. L; Doc. 32-5, ECF p. 6, Def.'s Ex. M; Doc. 32-5, ECF p. 8-9, Def.'s Ex. N; and Doc. 32-5, ECF p. 14, Def.'s Ex. P).[18]

After reviewing this information, Morris and Schmidt concluded that Velazquez should be terminated.  (Doc. 32, DSMF ¶ ¶ 110, citing Doc. 32-5, ECF p. 26, Morris Dep.; Doc. 32-5, ECF p. 42, Schmidt Dep.).[19]  Morris said the termination was

---

[18]  Plaintiff contests this allegation to the extent it names only Morris and Schmidt as the persons who decided to terminate him.  He argues the evidence also supports Lindsley and Taylor as decision makers as well.  In relevant part, he cites in support Defendant's answer to an interrogatory for Lindsley (Doc. 36-16, ECF p. 3) and Morris's deposition where she says that Taylor was part of the investigation because, while he was not in the room when the decision was made, "the documents came from" Taylor and Lindsley.  (Doc. 36-17, ECF p. 12).

[19]  Plaintiff contests this allegation but only to argue that Defendant has been inconsistent concerning who was involved in the termination decision.

based on the "document" they had.  (Doc. 32-5, ECF p. 26, Morris Dep.).  Schmidt said

the termination was based on the unauthorized break and Plaintiff's entire disciplinary

history.  (Doc. 32-5, ECF p. 42, Schmidt Dep.).

        Neither Lindsley, nor Morris, nor Schmidt knew that Velazquez had filed a

workers' compensation claim.  Neither Morris nor Schmidt knew that Plaintiff had

requested "pain breaks."  (Doc. 32, DSMF ¶ ¶ 111, and Plaintiff's response thereto).

Defendant alleges that Lindsley did not know that Plaintiff had requested pain breaks

before his termination, citing Doc. 32-2, ECF p. 4, Lindsley Decl. ¶ 19, but Plaintiff

presents evidence that Lindsley did know before the termination, that when Lindsley told

Plaintiff he was suspended, Plaintiff told him at that time he had been "on break due to

pain."  (Doc. 36-22, ECF p. 7, worker's compensation hearing transcript).[20]  Velazquez's

injury never came up in the discussion of his termination.  (Doc. 32, DSMF ¶ ¶ 112,

admitted by Plaintiff).  Morris terminated Velazquez on October 17, 2012 after the

conclusion of her meeting with Schmidt.  (*Id.*, DSMF ¶ ¶ 113, admitted by Plaintiff).[21]

        Meanwhile, during Velazquez's suspension, Velazquez allegedly left

several messages for Morris, and Amanda Yourse, an individual who handles worker's

compensation claims for ES3, seeking an update on the status of his employment.  In

one message for Morris, Velazquez threatened that if no one returned his phone call, he

---

[20]  Defendant argues Plaintiff cannot rely on this testimony from the worker's compensation hearing because it contradicts Plaintiff's deposition testimony.  For the reason given below in connection with the sham affidavit doctrine, we disagree with Defendant.

[21]  As noted above, Plaintiff does contest that Morris was the only person involved in the decision.

would contact the Pennsylvania Human Relations Commission ("PHRC").  Immediately after Velazquez says that he left the voicemail for Morris, Morris called him and terminated his employment.  (Doc. 32, DSMF ¶ ¶ 114-115, 117, admitted by Plaintiff).

Velazquez is one of twenty-six employees terminated for stealing time between October 2010 and October 2012 at the York facility, 16 of whom were not injured and did not file worker's compensation claims.  ES3 utilizes a third-party claims processor to handle all worker's compensation claims.  (Doc. 32, DSMF ¶ ¶¶ 118-119, admitted by Plaintiff).

Plaintiff's back injury causes him pains when moving or lifting repeatedly; standing, sitting, walking, running or driving for prolonged amounts of time; having sexual relations with his wife; and playing with his children.  His limitations have been consistent since his injury in July 2012 to the present.  Velazquez testified that although he could still be an incentive selector, he is not sure that he could meet 100% of ES3's productivity expectations.  Since Velazquez's termination from ES3, he has worked as a skilled laborer for various window companies.  He has also done freelance gardening work. (Doc. 32, DSMF ¶ ¶¶ 121-125, admitted by Plaintiff).

IV.   *Discussion*

A. *An Indirect-Evidence Analysis Under* McDonnell Douglas
*or a Direct-Evidence Analysis Under* Price Waterhouse

In moving for summary judgment, Defendants rely on the three-step, burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S.

792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for "pretext" cases, when a plaintiff has

indirect evidence of discrimination. *Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 n.2, 337-38

(3d Cir. 2002).  Plaintiff asserts the analysis should instead proceed under *Price*

*Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), which

governs cases where the plaintiff has direct evidence of discrimination, also known as

"mixed motives" cases, *Fakete*, 308 F.3d 337 n.2, because he has such evidence.

      "To qualify as direct evidence, 'the evidence must be such that it

demonstrates that the 'decisionmakers placed substantial negative reliance on an

illegitimate criterion in reaching their decision.'" *Anderson v. Wachovia Mortg. Corp.*, 621

F.3d 261, 269 (3d Cir. 2010)(quoting *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513

(3d Cir. 1997)).  For evidence to be direct, it must satisfy two requirements.  "First, the

evidence must be strong enough 'to permit the factfinder to infer that a discriminatory

attitude was more likely than not a motivating factor in the [defendant's] decision." *Id.*

(quoting *Walden*, 126 F.3d at 513)(brackets added in Anderson).  "Second, the evidence

must be connected to the decision being challenged by the plaintiff." *Id.*

      More specifically, "statements by nondecisionmakers" are not direct

evidence.  *Walden*, 621 F.3d at 513 (quoted case omitted).  Neither is a statement by  a

"decisionmaker[ ] unrelated to the decisional process itself." *Id.* (quoted case omitted).

On the other hand, "'statements of a person involved in the decisionmaking process that

reflect a discriminatory or retaliatory animus of the type complained of in the suit,'

[citations omitted] even if the statements are not made at the same time as the adverse

employment decision," are direct evidence. *Fakete*, *supra*, 308 F.3d at 339 (quoted case omitted).  Providing direct evidence is a "high hurdle" for the plaintiff.  *Walden*, 126 F.3d at 513.  The evidence must prove that the employer acted unlawfully, not merely establish a prima facie showing.  *Id.*

Plaintiff asserts that the evidence cited in his CSMF ¶¶ 96-100 constitutes direct evidence of discrimination.  As relevant to Plaintiff's argument, CSMF ¶¶ 96-100 essentially restate the events leading up to his suspension on October 13, 2012. Plaintiff had taken a pain break on October 12, about a half hour before midnight, a break that lasted about 35 or 40 minutes, during which he used the bathroom.  (Doc. 32, DSMF ¶ ¶ 67, citing Doc. 36-1, ECF pp. 53, 56-57, Velazquez Dep.).  During this time, he also went outside and purchased a hot dog from a lunch truck which was parked in ES3's parking lot.  (Doc. 32, DSMF ¶ ¶ 68, admitted by Plaintiff).

When Plaintiff came back inside, Taylor saw Velazquez and told Velazquez he thought he was fraternizing when he should have been working.  (Doc. 32, DSMF ¶ ¶ 71).  Plaintiff denied he was fraternizing and said that he was on pain break because his back was hurting and showed Taylor his Downtime Sheet.  (Doc. 36-1, CSMF ¶ 96, citing Doc. 36-1, ECF p. 53, 59, 67, and 96, Valezquez Dep.).  (Doc. 32, DSMF ¶ ¶ 72, and Plaintiff's response thereto).  Taylor issued Velazquez a final written warning.  (Doc. 32, DSMF ¶ ¶ 73 and Plaintiff's response thereto).  The final written warning states that "Early was found to be taking excessive breaks.  Early was found in the light duty sit down area talking to other associates at 2330 and has not picked a case since 2246."

-25-

(*Id.*, DSMF ¶ ¶ 74, admitted by Plaintiff; Doc. 32-5, ECF p. 11, Def.'s Ex. O, Employee

Counseling Record dated October 13, 2012).  Velazquez refused to sign the

documentation created by Taylor.  (*Id.*, DSMF ¶ ¶ 76, admitted by Plaintiff).  Taylor

instructed Velazquez to return to OS&D and begin his light duty assignment.  (*Id.*, DSMF

¶ ¶ 77, admitted by Plaintiff).

   Taylor sent Lindsley an e-mail on October 13, 2012, at 1:43 a.m.  The e-

mail said that Taylor had completed a Lawson counseling for Plaintiff's "excessive

breaks."  (Doc. 32-5, ECF p. 9).  When Velazquez returned from the lunch period he had

been instructed to take, he reported to Lindsley.  Lindsley told Velazquez that he was

suspending him for taking too many breaks.  (Doc. 36-1, ECF p. 53, Velazquez Dep.).

   Plaintiff asserts that "[t]his evidence alone is direct evidence of

discrimination and reflects a blatantly discriminatory animus."  (Doc. 35, Opp'n Br. at ECF

p. 9).  We disagree.  This evidence does not reflect a discriminatory animus, only that

Taylor and Lindsley thought Plaintiff had taken too many breaks, a valid concern for an

employer.

   Plaintiff next argues that these events, combined with the discriminatory

treatment Taylor gave the light-duty workers from July to October 2012, is direct evidence

of discrimination.  Plaintiff cites to his CSMF ¶¶ 80-87 in support of his argument.

   We think it is sufficient to look at paragraphs 80 and  82.  In pertinent part,

paragraph 80 cites to the following deposition testimony from Plaintiff.  First, there were

times when Taylor had Plaintiff sweeping when Plaintiff had restrictions from his doctor,

and Plaintiff requested an accommodation that would maybe not put him on sweeping.

(Doc. 36-1, ECF pp. 45-46).  Second, Taylor threatened to suspend and terminate

Plaintiff (and suspend other light-duty workers) because one time they did not sign the

sign-out sheet (the Light Duty Tracker) for one of their fifteen- minute breaks, even

though they did not sign because there was no pencil available to sign the sheet.  (Doc.

36-1, ECF pp. 45, 95).  Third, Taylor once walked by OSD, saw Plaintiff sitting at the

computer, and stated that every time Taylor was over there, Plaintiff was sitting.  (Doc.

36-1, ECF pp. 78, 79).[22]

In pertinent part, paragraph 82 cites the observations of Lee Yeager,

another light-duty employee, as follows:

> 1.  Taylor told one light-duty employee that he should "not to
> be sitting down so much"  (Doc. 36-28, Yeager Dep., ECF pp.
> 23-24);
>
> 2.  Taylor told the light-duty employees, including Plaintiff,
> that they were "faking" their injuries, often on multiple
> occasions (*id.*, ECF pp. 27, 49-50);
>
> 3.  Taylor would tell the light-duty employees they were
> going to be fired for not doing their jobs and that they needed
> to try (*id.*, ECF p. 29);
>
> 4.  If a light-duty employee's medical restrictions included
> rest breaks in addition to the breaks normally allowed, Taylor
> would tell the employee, including Plaintiff, to get back to
> work, generally telling the worker that he needed to get back

---

[22]  Other examples of belittling or inappropriate treatment were: (1) on the second day
of transitional work, Taylor required that Velazquez select for the first half of his shift and
perform light duty tasks for the second half when it made no sense; (2) Taylor's failure to
understand that Plaintiff took pain breaks for his back when Plaintiff told him he had back pain.
(Doc. 36-1, ECF p. 79).

to work if he saw him standing around taking a rest (*id.*, ECF p. 29-30;

5.  Yeager saw Taylor do this with Plaintiff (*id.*, ECF p.30);

6.  Yeager saw Taylor on several occasions yell at Plaintiff to get back to work while he was resting his back (*id.*, ECF 96-97);

7.  Despite Plaintiff's explaining to Taylor that he was on his break, Taylor told him, "you need to do it now, although Yeager does not remember if Plaintiff explained he was on a break because of his restrictions (*id.* ECF p. 97);

8.  While Yeager was taking a break to  rest his back, Taylor told him, "why are you sitting down.  We need you to keep sweeping.  I need you to get these aisles cleaned up faster.  You got to keep moving.  We can't have you sitting down" (*id.*, ECF p. 41);

9.  Taylor told Yeager that his injury was "a joke" and that he was "not honest about [his] injury" (*id.*, ECF p. 48);

10.  When Yeager explained to Taylor that Yeager was taking a break to sit down, Taylor would tell Yeager, "you're going to end up getting yourself fired.  This is not your work restrictions.  You've taken way too many breaks."  (*id.*, ECF p. 40);

11.  Taylor told Shawn Widener, another light-duty worker, who had a hand injury, to pick up pallets, even though Widener was medically restricted to the use of one hand (*id.*, ECF p. 24; Doc. 36-29, Plf.'s Ex. CC, Widener Dep., ECF p. 23);

12.  Each morning Taylor would tell each light-duty worker where to sweep.  They would tell him they would do it, but that they needed time.  They could not sweep for two hours straight.  And he would say, "you need to just do it and get it done" (Doc. 36-28, ECF p. 44).

-28-

Before we can consider Plaintiff's argument that this constitutes direct evidence of discrimination, we must address Defendant's argument that Plaintiff cannot rely on Yeager's testimony because it contradicts Plaintiff's testimony.  Defendant contends that Plaintiff testified that Taylor's mistreated him in only three ways, as described above, (see Doc. 36-1, ECF p. 78 (Plaintiff could not recall any other categories); *id.*, ECF p. 80 (Plaintiff cannot recall any other comments), and that Yeager contradicts him by adding other comments made by Taylor that reflect discriminatory animus.

In support of this argument, Defendant cites in part *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005), and *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995).  In both of these cases, the courts ruled that in opposing summary judgment the plaintiff could not rely on testimony of other witnesses that contradicted his own.

We decline to follow these cases.  Our starting point is *Prosser*'s reasoning for its ruling, that it was a valid extension of the sham affidavit doctrine.  *Id.*  Under this doctrine, the nonmoving party on summary judgment cannot create a material issue of fact by submitting an affidavit that contradicts his prior deposition without plausibly explaining the conflict.  *Baer v. Chase*, 392 F.3d 609, 623-24 (3d Cir. 2004).  Its purpose is to preserve the utility of summary judgment by preventing a party from creating a material issue of fact "simply by submitting an affidavit contradicting his own prior testimony . . . ."  *Id.* at 624 (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).  However, when independent evidence in the record bolsters

the affidavit, the doctrine is not applied because such evidence alleviates the concern that the affidavit is a "mere sham." *Id.* at 625 (internal quotation marks and quoted case omitted). Thus, and on facts similar to the instant case, the Ninth Circuit held that the sham affidavit doctrine did not preclude a plaintiff from opposing summary judgment by relying on the independent deposition testimony of other witnesses arguably inconsistent with his own deposition. *Nelson v. City of Davis*, 571 F.3d 924, 929 (9th Cir. 2009). Deposition testimony conflicting with the nonmoving party's testimony may create a factual issue to be resolved by the fact finder, *Palazzo v. Corio*, 232 F.3d 38, 44 (2d Cir. 2000), but it does not preclude that testimony from being considered on summary judgment.

Thus, we can consider Yeager's testimony on summary judgment, but even when we do so, it does not constitute direct evidence of discrimination because the remarks were not made by a decision maker, one of the requirements for direct evidence. This conclusion also applies to Plaintiff's own testimony concerning Taylor's remarks to him.

For Taylor's comments to constitute direct evidence (leaving aside whether they reflect discriminatory animus), Taylor must have been "involved in the decision to fire" Plaintiff, more specifically, that he "recommended" the decision or that he "influenced" the decision. *Walden*, *supra*, 126 F.3d at 516. It is not enough that Taylor held a position of authority with Defendant if his statements were unconnected to the decision. *Id.* at 514.

The evidence does not show the necessary involvement.  Plaintiff's discharge started with Taylor in that it was Taylor, observing what he perceived to be Plaintiff's fraternizing, who issued Velazquez a final written warning, (*id.*, DSMF ¶ ¶ 73 and Plaintiff's response thereto), stating that "Early was found to be taking excessive breaks" and "was found in the light duty sit down area talking to other associates." (*Id.*, DSMF ¶ ¶ 74, admitted by Plaintiff; Doc. 32-5, ECF p. 11, Def.'s Ex. O, Employee Counseling Record dated October 13, 2012).  Taylor also informed Lindsley that he had seen Plaintiff not working and had done some investigating, probably running the query that showed Plaintiff had last picked a case at 22:46 hours.  (DSMF ¶ ¶¶ 80-81, admitted by Plaintiff).  But from there, the evidence shows that Lindsley investigated, and then Morris and Schmidt made the decision to terminate Plaintiff.  There may be a dispute as to who else participated in the decision, Lindsley, Kelley Robinson, or Andy Kakos, see note 17 above, but any dispute in regard to these individuals is immaterial as Taylor is not mentioned.  Plaintiff contends that Morris said that Taylor was a decision maker, but we disagree.  Morris said only that "the documents came from" Taylor and Lindsley. (Doc. 36-17, ECF p. 12).  This does not make Taylor a decision maker.

Since there is no direct evidence of discrimination, we will analyze Plaintiff's ADA and PHRA claims under the burden-shifting framework established in *McDonnell Douglas* for "pretext" cases rather than use the *Price Waterhouse* analysis.

B. *The ADA and PHRA Claims Based on Plaintiff's Discharge*

Defendant moves for summary judgment on Plaintiff's ADA and PHRA claims that challenge his discharge.  We use federal law for both claims because the PHRA analysis is the same as the ADA's.  *See Barber v. Subway*, ____ F. Supp. 3d ____, ___, 2015 WL 5530256, at *7 (M.D. Pa. 2015)(citing *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir. 1996)).

> In order to establish a prima facie case of disparate treatment under the ADA, a plaintiff must show "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination."  *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998); *see also Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir. 1998)(en banc)(citing *Gaul*).

*Shaner v. Synthes (USA)*, 204 F.3d 494, 500 (3d Cir. 2000).

> [T]he *McDonnell Douglas* analysis proceeds in three stages.  First, the plaintiff must establish a prima facie case of discrimination.  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  [*McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.]  Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  [citation omitted].

*Id.*

For the purpose of its summary judgment motion, Defendant assumes that Plaintiff can establish a prima facie case.  It then argues that it has articulated a

legitimate, nondiscriminatory reason for his discharge: an unauthorized absence from work while he was on the clock, also described by Defendant as "theft of time." (Doc. 31, Supp'n Br. at ECF p. 10). We agree with Defendant that it has met its burden on the second stage of the analysis. Its burden here is "relatively light." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). Defendant need only introduce evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable [action]." *Anderson*, *supra*, 621 F.3d at 271 (quoted case omitted). Defendant "need not even prove that the tendered reason was the actual reason for its behavior." *Id.*

At the next stage of the *McDonnell Douglas* analysis, Plaintiff has the burden of showing that the stated reason was a pretext for discrimination. *Shaner*, 204 F.3d at 500. "A plaintiff may demonstrate pretext at summary judgment in two different ways. First, the plaintiff may point to evidence in the record that would cause a reasonable juror to disbelieve the employer's articulated legitimate non-discriminatory reason . . . ." *Burton*, *supra*, 707 F.3d at 430. "Second, the plaintiff may also defeat summary judgment by pointing to evidence that indicates that the employer acted with discriminatory animus." *Id.* at 430-31. Stated differently, on the second way, Plaintiff can defeat summary judgment by pointing to evidence that would lead a reasonable juror to believe "that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Shaner*, *supra*, 204 F.3d at 501 (internal quotation marks and quoted cases omitted).

Plaintiff can satisfy the first way, which deals with discrediting the articulated legitimate reason for Defendant's action, by providing evidence that "demonstrate[s] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence." *Burton*, 707 F.3d at 427 (quoted case and internal quotation marks omitted).  Plaintiff "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

In moving for summary judgment, Defendant argues there is no evidence showing inconsistencies or contradictions that would support the inference that its reason for terminating Plaintiff was pretextual.  It relies on the following facts.  First, Plaintiff was disciplined with a three-day suspension for an April 2012 incident when, without approval and while still on the clock, he spent two hours on the telephone with his wife resolving a domestic dispute.  The Counseling Record for this incident advised Plaintiff that similar incidents could result in termination.  Second, on the incident in October 2012 that led to his termination, Plaintiff took a break of approximately 35 or 40 minutes, during which he used the bathroom, went outside and purchased a hot dog from a lunch truck, all without clocking out or recording the time as break time on the Light Duty Tracker.  This incident was investigated by Lindsley before he suspended Plaintiff.  It was then reviewed by senior management, who decided to terminate Plaintiff.  Third, others outside the favored

class were treated the same.  Velazquez is one of twenty-six employees terminated for

stealing time between October 2010 and October 2012 at the York facility, 16 of whom

were not injured and did not file workers compensation claims.

        In opposing summary judgment, Plaintiff argues there "is an abundance of

evidence" of pretext using either way, discrediting the reason given, or providing

evidence that disability discrimination was more likely than not a motivating or

determinative cause of the employer's action.  Doc. 35, Opp'n Br. at ECF p. 17).

Plaintiff's argument combines the evidence in support of both ways and is sometimes

duplicative.  (*Id*., ECF at pp. 17-18).  We will discuss here the evidence that appears to

support his argument on the first way.

        There are only two items of evidence that appear relevant to this prong of

the analysis.  First, Lindsley told Plaintiff he was being suspended for taking too many

breaks.  (Doc. 36, Pl.'s CSMF ¶ 100, citing Doc. 36-22, ECF pp. 6-7, Velazquez

testimony from the worker's compensation hearing transcript), but after Plaintiff filed his

lawsuit, "Defendant changed its story and first alleged that Mr. Valazquez had been

terminated for 'stealing time.'" (Doc. 35, Opp'n Br. at ECF p. 17).  In the court's view,

"excessive breaks" or "stealing time" is essentially the same reason for Defendant's

action and does not satisfy Plaintiff's burden on the first prong.

        Second, Defendant has been inconsistent in identifying who made the

decision to terminate him.  (Doc. 35, ECF p. 18).  We reject this argument as well.  It is

true that Defendant's witnesses have not been consistent as to who was involved in the

decision to terminate Plaintiff.  As shown in note 17 above, sometimes in addition to

Morris and Schmidt, Lindsley and Robinson participated; or Morris and Kakos made the

decision; or it was Morris, Kakos, Lindsley and possibly the first shift manager.  This

inconsistency is not material as the first way of showing pretext involves inconsistency in

the reason for the employer's action, not who participated in the action, and the reason

here has always been consistent, Plaintiff was taking unauthorized breaks.  *See*

*Proudfoot v. Arnold Logistics, LLC*, ____ F. App'x ____, ____, 2015 WL 5881530, at *3 (3d

Cir. 2015) (nonprecedential) ("slight inconsistencies as to who made the ultimate decision

to terminate Proudfoot do not demonstrate that the reason provided for his termination

was pretextual").

      We turn now to the other way of showing pretext and whether Plaintiff has

provided enough evidence to lead a reasonable juror to believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of

Defendant's action.

      To satisfy this prong of the analysis, Plaintiff principally relies on his own

testimony and the testimony of his fellow light-duty worker, Lee Yeager, concerning

Taylor's negative treatment of him, and of the other light-duty workers, which Plaintiff

asserts reflects Taylor's discriminatory animus.  *See Fuentes*, 32 F.3d at 765 (the plaintiff

can satisfy the second way "by showing that the employer in the past had subjected him

to unlawful discriminatory treatment, that the employer treated other, similarly situated

persons not of his protected class more favorably, or that the employer has discriminated

against other members of his protected class or other protected categories of persons").

*See also Ezold v. Wolf, Block, Schoor & Solis-Cohen*, 983 F.2d 509, 546-47 (3d Cir.

1992)(discriminatory statements by nondecision-making law firm partner relevant to

showing pretext, noting that "proof of a discriminatory atmosphere" sheds light on the

influences on the employer's decision in regard to the plaintiff); *Johnson v. Federal*

*Express Corp.*, No. 12-CV-444, 2014 WL 805995, at *7 (M.D. Pa. Feb. 28, 2014)

(evidence of discriminatory conduct in the workplace is relevant to showing that the

proffered reason is pretextual).

   Plaintiff finds the evidence to support these assertions in part in his CSMF

¶¶ 80-87.  We describe the relevant evidence these paragraphs cite as follows.  At his

deposition, Plaintiff complained about Taylor in the following ways.  First, Taylor had him

sweeping, which involves a swinging motion, when Plaintiff had restrictions from his

doctor to "sit and stand as needed due to pain and so forth, things of that nature."

Plaintiff told Taylor about these things.  (Doc. 36-1, ECF p. 45; Valazquez Dep.).  As

already noted, Plaintiff also complained about Taylor threatening to suspend him and

terminate him one time for not filling out the Light Duty Tracker and that he had remarked

that he always saw Plaintiff sitting down when he passed OS&D.  (*Id.*, ECF pp. 78 and

95).

   At his deposition, Yeager said the following about Taylor.  First, Taylor told

one light-duty worker he should not be sitting down so much.  (Doc. 36-28, ECF pp. 23-

24, Yeager Dep.).  Second, Taylor told Yeager, Plaintiff and other light-duty workers that

they were "faking [their] injuries" and telling them that their injuries were not "real." (*Id.*, ECF pp. 26, 27, 49-51).   Third, Taylor told them they would be fired for not doing their jobs, that they had to try.  (*Id.*, ECF p. 29).   Fourth, if light-duty workers had restrictions that enabled them to take more than the normally scheduled breaks, Taylor would tell them to get back to work; this happened with Plaintiff and two other light-duty workers. (*Id.*, ECF p. 30).  Fifth, Taylor yelled at Plaintiff to get back to work while he was resting his back.  Yeager saw this about 5 to 10 times.  (*Id.*, ECF pp. 96-97).  Despite Plaintiff's explaining to Taylor that he was on his break, Taylor told Plaintiff "you need to do it now." Yeager does not remember if Plaintiff explained he was on a break because of his restrictions.  (*Id.*, ECF p. 97).  Sixth, Taylor told Yeager that his injury was "a joke" and that he was "not honest about [his] injury."  (*Id.*, ECF p. 48).

Plaintiff makes other points about the evidence that, in his view, establish discriminatory animus.  He lists them as follows:

> 1.  On October 12, 2012, Taylor "falsely accused" him of fraternizing with coworkers "when he clearly was not doing so," (Doc. 35, Opp'n Br. at ECF p. 17), and issued him a final written warning for taking breaks for his back injury and calling it "'excessive breaks.'"  Taylor then reported "this disputed conduct" to Lindsley.

> 2.  Defendant can permit employees to take periodic breaks for injury or a medical condition, but when Plaintiff "informed Taylor of this requested accommodation," Defendant not only failed to permit him to take a break, "but also yelled at him for doing so, threatened to terminate him for doing so,  issued him a written discipline for doing so and then suspended him for doing so."

-38-

   3.  Plaintiff "was fired within a few months of disclosing his medical condition and requesting accommodations (light duty and periodic breaks) and within hours of complaining about discrimination and informing Defendant of his intent to file a complaint with the PHRC."

(Doc. 35, Opp'n Br. at ECF p. 18).

   We do not think the last three examples would allow a reasonable juror to conclude that discriminatory animus was a motivating factor in Plaintiff's discharge. There is no evidence that Taylor "falsely accused" Plaintiff of fraternizing with coworkers "when he clearly was not doing so," or that Taylor's October 12, 2012, final written warning was issued for taking breaks for his back injury but falsely called "excessive breaks."  Plaintiff admits he took four to five breaks, each lasting between 10 and 40 minutes, without clocking out.  These breaks were also not listed on his Downtime Sheet. He then took the pain break that led to his dismissal, one of approximately 35 or 40 minutes, during which he used the bathroom.  Plaintiff admits Taylor saw him in the light-duty sit-down area as Plaintiff was close to this area to retrieve his parking jack. (Doc. 36-1, ECF p. 53, Valazquez Dep.).  Further, Taylor noted in his e-mail that Plaintiff had not picked a case since 22:46, supported by a company record (by way of a query run by another employee).

   Plaintiff' second scenario also does not support a reasonable inference of discriminatory animus.  Defendant permits employees to take periodic breaks for injury or a medical condition, but the employee must first notify his supervisor, when possible, and when he is about to take the break.  Here, there is no evidence that Plaintiff notified

Taylor ahead of time for each break.  There is also no evidence that Taylor issued him a written discipline for taking a break, or suspended him for doing so, although we understand Plaintiff argues those inferences can be drawn from Defendant's conduct.[23]

On the third example, "the timing of events surrounding an employee's dismissal may raise an inference of discrimination," *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 640 (3d Cir. 1993)(citing *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 62 (3d Cir. 1989)), but Plaintiff's third example does not take into account all the circumstances surrounding Plaintiff's firing.  We provide more detail below but note that this argument does not take into account that the decision to fire Plaintiff was made based on objective evidence and by decision makers who exhibited no discriminatory animus toward Plaintiff.

That leaves for consideration Taylor's allegedly discriminatory remarks toward Plaintiff and the other light-duty workers.  The significant ones involve the following: (1) Taylor told one light-duty worker he should not be sitting down so much; (2) Taylor told Yeager, Plaintiff and other light-duty workers that they were "faking [their] injuries" and telling them that their injuries were not "real"; (3) Taylor told them they would be fired for not doing their jobs, that they had to try; (4) if light-duty workers had restrictions that enabled them to take more than the normally scheduled breaks, Taylor would tell them to get back to work; (5) Taylor yelled at Plaintiff about 5 to 10 times to get

---

[23]  We will deal with Taylor's yelling and threatening termination for taking a break below.

back to work while he was resting his back; and (6) Taylor told Yeager that his injury was "a joke" and that he was "not honest about [his] injury."

We do not think these remarks, even in combination with the other evidence Plaintiff cites above, provide a reasonable inference that Plaintiff was terminated based on disability. We essentially follow Defendant's reasoning. First, we note that Plaintiff admits he committed the act that was the reason for his discharge: a pain break while he was still on the clock of approximately 35 or 40 minutes, during which he used the bathroom and went outside to buy a hot dog. Plaintiff says he was authorized to take this break, but he had to report the break to a supervisor and record it on his Downtime Tracker, neither of which he did.

Second, that this break was unauthorized is supported by documentary evidence. Lindsley reviewed a report within the Company's computer system, which showed that Velazquez had last selected a case of product at 22:46.[24] Additionally, Lindsley viewed video footage showing that Velazquez arrived at the lunch truck at 23:22 and stayed there until 23:32. Lindsley also reviewed Velazquez's Light Duty Tracker, clock punches, and Downtime Sheet. Lindsley forwarded this information (except for the video) to the decision makers,[25] Morris and Schmidt, who relied on the documentary

---

[24] Taylor also noted this record in his e-mail.

[25] Plaintiff has presented evidence that Lindsley was also a decision maker. (Doc. 36-16, ECF p. 3, Defendant's answer to interrogatory 4 of Plaintiff's first set of interrogatories. Defendant admits he participated in the decision. (Doc. 38, Dft.'s response to Pl.'s CSMF ¶ 116, citing Lindsley Dep., Doc. 36-15, ECF p. 61 (Lindsley recommended suspension pending termination). Lindsley's participation in the decision is immaterial since Plaintiff has presented no evidence that Lindsley exhibited animus toward Plaintiff or other light-duty workers.

evidence in discharging Plaintiff: Plaintiff's prior discipline for theft of time, the light duty log, Velazquez's Downtime Sheet, Velazquez's clock out punches, and a screen shot of Velazquez's selection history for October 12, 2012.[26]

Third, Plaintiff has presented no evidence that the decision makers exhibited any discriminatory animus toward Plaintiff or other light-duty workers.  Morris had not met Plaintiff, and Schmidt's interactions with him were limited to saying "Hi" in passing.  Lindsley was also a decision maker, but Plaintiff stated that no other supervisor other than Taylor treated him inappropriately.

Fourth, neither Morris nor Schmidt knew that Plaintiff had requested pain breaks, and while both of them knew that he was working on light duty, and Schmidt knew that he had suffered a work-related injury, Plaintiff's injury never came up in the discussion of his termination.  Fifth, Schmidt stated he had taken into account Plaintiff's discipline history, and Plaintiff had previously been disciplined in May 2012 for taking a prolonged break while still on the clock and was advised that any future violation could result in dismissal.

Sixth, Plaintiff participated in the TAD program from October 13, 2010, through February 6, 2011, and makes no complaint about his treatment during this light duty assignment; in fact, he admits he was treated "fairly."  Finally, Plaintiff is one of twenty-six employees terminated for stealing time between October 2010 and October 2012 at the York facility, 16 of whom were not injured.

---

[26]  They also relied on the e-mail statements by Lindsley and Taylor, but in material part these merely referenced the documentary evidence as well.

Plaintiff contests that only Morris and Schmidt were the persons who decided to terminate him.  In addition to Lindsley as noted above, he argues the evidence also supports Taylor as a decision maker as well.  In relevant part, he cites in support Morris's deposition where she says that Taylor was part of the investigation because, while he was not in the room when the decision was made, "the documents came from" Taylor and Lindsley.  (Doc. 36-17, ECF p. 12.).  This does not establish Taylor as a decision maker, only that the documents upon which the decision makers relied came from Taylor.

Plaintiff also asserts that a cat's paw theory of liability allows him to rely on Taylor's animus to show that his discharge was motivated by discrimination, even if there is no evidence that any of the decision makers, Lindsley, Morris or Schmidt, harbored any animus.  Under a cat's paw theory of liability, a plaintiff can rely on the act of a supervisor "motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action" if that act is a proximate cause of the ultimate employment action . . . ."  *Staub v. Proctor Hosp.*, 562 U.S. 411, 422, 131 S.Ct. 1186, 1194, 179 L.Ed.2d 144 (2011)(emphasis in original).  Proximate cause "requires 'some direct relation between the injury asserted and the injurious conduct alleged' and excludes links that are 'remote, purely contingent, or indirect.'"  *Jones v. Southeastern Pennsylvania Transp. Auth.*, 796 F.3d 323, 330 (3d Cir. 2015)(quoting *Staub*, 562 U.S. at 419, 131 S.Ct. at 1192)(case quoted in *Staub* omitted).

We agree with Defendant that Plaintiff cannot rely on a cat's paw theory because the decision makers conducted an independent investigation relying on documentary evidence, as described above.  In these circumstances, proximate cause does not exist.  The instant case is analogous to *Jones.*  There, the plaintiff employee was terminated for timesheet fraud.  The Third Circuit stated the plaintiff could not rely on a cat's paw theory when the employer conducted an investigation independent of the biased supervisor, an investigation "that relied on forensic handwriting analysis (to determine if the signatures on Jones's timesheets were phony) and 'email, computer, and building access records.'"  796 F.3d at 331 (quoting the district-court opinion).  As in *Jones*, Defendant here did not rely on facts provided by the biased supervisor (Taylor), so a cat's paw theory does not apply.  *Id.*  It is true that Taylor told Lindsley about the unauthorized break, and the investigation may not have happened without that, but that is "but for" causation, and Plaintiff has to establish proximate cause.  *Id.* at 330 (biased supervisor's initial report of timesheet fraud that led to investigation was only "but for" cause of termination).[27]

---

[27]  Plaintiff has cited *Hudson v. Guardsmark, LLC*, No. 12-CV-1255, 2013 WL 6150776 (M.D. Pa. Nov. 22, 2013).  That case is distinguishable because, unlike here, there was a "consultation" between the biased supervisor and the decision makers concerning the plaintiff's discharge.  *Id.* at *13.

Since Plaintiff has failed to show that Defendant's proffered reason for dismissal was pretextual, we will enter summary judgment on Plaintiff's ADA and PHRA discrimination claims based on his discharge.[28]

C. *The ADA and PHRA Retaliation Claims*

Defendant has moved for summary judgment on Plaintiff's ADA and PHRA retaliation claims.  For both of these claims we can rely on the elements of an ADA retaliation claim.  *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002)(anti-retaliation provisions of the ADA and PHRA are governed by the same set of precedents).

Since we decided above that Plaintiff had no direct evidence of discrimination, our framework for analyzing the retaliation claims will be under the pretext theory set forth in *McDonnell Douglas*.  We begin with the prima facie case.  *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

> To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. [citations omitted].

*Id.*  If Plaintiff establishes a prima facie case, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action."  *Id.*  The employer's burden is "relatively light" at this stage.  It need only prove "any legitimate

---

[28] In doing so, we see no need to address Defendant's argument that Plaintiff was not disabled under the PHRA.

reason" for the action and need not even prove that the stated reason is the real reason. *Id.* at 500-01 (internal quotation marks and quoted case omitted). "If the employer satisfies its burden, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* at 501 (cited case omitted).

For the purpose of the summary judgment motion, Defendant concedes that Plaintiff can establish the first two elements of his prima facie case. Defendant argues that Plaintiff has not established the third element, causation.

> We consider "a broad array of evidence" in determining whether a sufficient causal link exists to survive a motion for summary judgment. *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 284 (3d Cir. 2000). Where the temporal proximity between the protected activity and the adverse action is "unusually suggestive," it is sufficient standing alone to create an inference of causality and defeat summary judgment. *See Clark County School Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)(temporal proximity alone, when "very close," can in some instances establish a prima facie case of retaliation); *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989)(reversing summary judgment in favor of the defendant where plaintiff had been discharged two days after his employer's receipt of his EEOC claim). Where the temporal proximity is not "unusually suggestive," we ask whether "the proffered evidence, looked at as a whole, may suffice to raise the inference." *Farrell,* 206 F.3d at 280 (internal citation and quotation marks omitted). Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus. *Id.* at 279–81.

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232-33 (3d Cir. 2007).

Plaintiff argues there is causation based on direct evidence of discrimination.  He relies on the argument he made above in connection with his ADA and PHRA discrimination claims, based on Taylor's discriminatory remarks, Taylor's issuance of a final warning, and Lindsley's statement that he was being suspended, according to Plaintiff, for taking too many breaks.  (Doc. 35, Pl.'s Opp'n Br. at ECF p. 23). For the reasons we discussed above, this evidence is not direct evidence of discrimination.  For the same reasons, we conclude that it is not sufficient evidence on summary judgment to support an inference  of causation.

Plaintiff next argues that he can show causation circumstantially by "suggestive timing and ongoing antagonism."  (Id.).  We do not consider the temporal proximity between the protected activities (the request for light duty and for pain breaks) and Plaintiff's discharge as unusually suggestive of causation.  Plaintiff's termination occurred some two months after Plaintiff was placed on light duty and after he would have begun to request pain breaks from Taylor.  *See LeBoon*, *supra*, 503 F.3d at 233 ("a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment").  Plaintiff cites *Fasold v. Justice*, 409 F.3d 178, 189-90 (3d Cir. 2005), where the Third Circuit held that a gap of less than three months was sufficient, but there the court had other evidence by way of remarks made by the district attorney who fired the plaintiff.  *Id.* at 190.

Nor is Plaintiff assisted by the other evidence he cites, "the ongoing antagonism."  We take this as a reference to Taylor's remarks to the light-duty

employees.  Again, for the reasons we discussed above in connection with the ADA and PHRA discrimination claims, we conclude that this is not sufficient evidence on summary judgment to support an inference of causation.

Finally, Plaintiff argues that the temporal proximity between the threat he made in a phone call a few days after his suspension to contact the PHRC if no one returned his call and his firing, which occurred immediately after he left the message, is unusually suggestive of causation.  (Doc. 35, Pl.'s Opp'n Br. at ECF p. 24).

We agree with Defendant that Plaintiff cannot rely on these facts to establish causation.  "Employers are not obliged to suspend all previously planned or contemplated actions upon receiving a . . . complaint or learning that a suit has been filed."  *Windfelder v. May Dep't Stores Co.*, 93 F. App'x 351, 355 (3d Cir. 2004) (nonprecedential)(citing *Clark County School Dist. v. Breeden,* 532 U.S. 268, 272, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001)).  Here, Plaintiff had been advised in the April 2012 counseling record for an unauthorized break that any similar infractions could include termination.  In the October 12, 2012, incident, Taylor's final written warning also advised Plaintiff that further disciplinary action could include termination.  (Doc. 32-5, ECF p. 11).  In these circumstances, the unusually short time between Plaintiff's phone call and his termination is not sufficient at the summary-judgment stage to support an inference of causation.

It is not material that there is a factual dispute concerning the purpose of the suspension and thus that it is arguable as to what the employer contemplated.[29]  It is sufficient that Plaintiff knew he could be terminated for taking unauthorized breaks, even if termination was not mentioned at the time he was suspended before he engaged in the protected activity.  *See Proudfoot v. Arnold Logistics, LLC*, ____ F. App'x ____, ____, 2015 WL 5881530, at *4 (3d Cir. 2015)(nonprecedential)(observing that the employer "had a written policy notifying employees that threats in the workplace could result in termination" in ruling that the plaintiff could not make a retaliation claim based on protected activity that followed the employer's telling him he was being investigated for making threats).

Even if this evidence would allow a reasonable juror to conclude that there was causation, we agree with Defendant that, in any event, it is not sufficient, for the reasons given in connection with the ADA and PHRA discrimination claims, to meet his burden on summary judgment to show pretext.  We will therefore enter summary judgment on the ADA and PHRA retaliation claims.

D.  *The ADA Failure-to-Accommodate Claim*

Defendant moves for summary judgment on Plaintiff's ADA failure-to-accommodate claim.  "[A] failure to make a reasonable accommodation for a disabled and qualified employee constitutes discrimination under the ADA."  *Williams v.*

---

[29]  According to Lindsley, he suspended Velazquez pending termination.  According to Plaintiff, Lindsley suspended him "until further investigation."  (Doc. 36-1, ECF p. 61).

*Philadelphia Hous. Auth. Police Dept.*, 380 F.3d 751, 771 (3d Cir. 2004).  An employer

has a duty under the ADA to engage in an "interactive process" with the employee to

determine if there is a disability and whether a reasonable accommodation can be made.

*Id.*

> An employee can demonstrate that an employer breached its
> duty to provide reasonable accommodations because it failed
> to engage in good faith in the interactive process by showing
> that:
>
> > 1) the employer knew about the employee's disability; 2) the
> > employee requested accommodations or assistance for his
> > or her disability; 3) the employer did not make a  good faith
> > effort to assist the employee in seeking accommodations;
> > and  4) the employee could have been reasonably
> > accommodated but for the employer's lack of good faith.

*Id.* at 772 (quoting *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 319–20 (3d Cir.

1999)).

Plaintiff indicates that this claim is based on Taylor's alleged refusal to allow

Plaintiff the needed "pain breaks" Plaintiff requested from him during the time Taylor

supervised him in the TAD program from about August 2012 through October 12, 2012.

(Doc. 35, Pl.'s Opp'n Br. at ECF p. 26).

In its supporting brief, Defendant first argues the claim is not really a failure-

to-accommodate claim but is instead a retaliation claim.  In making this argument,

Defendant relies on paragraphs 36 through 45 of the Complaint (Def.'s Br. in Support at

ECF p. 18 n.3), mentioning paragraph 40 specifically in its reply brief.  (Doc. 37, ECF p.

21).  Based on these allegations, Defendant contends that Plaintiff has pled in support of

this claim that he was terminated for taking the pain breaks, not that he was denied them. (Doc. 31, Def.'s Br. in Support at ECF p. 18 n.3).  According to Defendant, the claim is therefore properly understood as an ADA retaliation claim.  Defendant cites in support two cases dealing with claims under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq.  In *Stephenson v. JLG Indus., Inc.*, No. 09-CV1643, 2011 WL 1304625, at *5 (M.D. Pa. Mar. 31, 2011), a colleague on this court held that an FMLA interference claim based on the plaintiff's discharge was really a FMLA retaliation claim. In *Atchison v. Sears*, 666 F. Supp. 2d 477, 488-89 (E.D. Pa. 2009), the court ruled that an FMLA interference claim based on the same adverse employment action (termination) as the retaliation claim could only proceed as a retaliation claim.

We reject Defendant's argument.  As we read the Complaint, it does not base Plaintiff's failure-to-accommodate claim on his discharge, which would be necessary to apply *Stephenson* and *Atchison* here.  In paragraph 41 of the Complaint, Plaintiff makes what appears to be a claim for failure to accommodate separate from a retaliation claim.  Additionally, the factual basis of the claim is different.  As noted above, Plaintiff bases his failure-to-accommodate claim on the time Taylor supervised him in the TAD program from about August 2012 through October 12, 2012, when Taylor allegedly refused to grant him requested pain breaks.

In its reply brief, Defendant argues that Plaintiff's claim cannot proceed because the claimed refusal to provide pain breaks is based on Lee Yeager's testimony, not Plaintiff's, and Plaintiff cannot rely on this testimony when it conflicts with his own, as

argued above in reliance on *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005), and *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995).  We have already decided not to apply *Evans* and *Prosser*, so Defendant's argument is rejected.

Defendant next argues that even if Yeager's testimony is considered, the claim fails because the only specific date that Plaintiff requested pain breaks was on October 12, 2012, the day he was suspended and his last day of work.  Citing *Ungerleider v. Fleet Mortg. Grp.*, 329 F. Supp. 2d 343, 355 (D. Conn. 2004)("failure to immediately provide Ungerleider with the specific accommodation that she sought does not constitute a refusal to provide a reasonable accommodation"), Defendant maintains that it did not have sufficient time to engage in the interactive process.  We decline to accept this argument at the summary-judgment stage Yeager's testimony could very well show that Plaintiff had requested pain breaks earlier than October 12.

Defendant also argues in its reply brief that the approximately two-month period at issue is too short to support a failure-to-accommodate claim.  It cites cases where similarly short periods of time between the request and receiving the accommodation were held not sufficient to allow a failure-to-accommodate claim, *Hudson*, *supra*, 2013 WL 6150776, at *11 (three months); *and Terrell v. USAir, Inc.*, 955 F. Supp. 1448, 1454 (M.D. Fla. 1996)(one month), even where the plaintiff alleged the employer failed to meaningfully engage in the interactive process.  *Hudson*, *supra*, 2013 WL 6150776, at *11.

We find this argument has merit.  The cited cases are not entirely analogous since the plaintiffs there were accommodated, and here Plaintiff was not.  But Plaintiff was not accommodated because he was discharged for a non-redressable reason.  We will therefore grant summary judgment on the ADA failure-to-accommodate claim.[30]

E.  *The Worker's Compensation Retaliation Claim*

Defendant moved for summary judgment on Plaintiff's worker's compensation retaliation claim, which alleges Plaintiff was fired for making a worker's compensation claim.  Plaintiff did not oppose the motion, instead stating that he was "voluntarily withdraw[ing]" the claim.  (Doc. 35, Pl.'s Opp'n Br. at ECF p.2).  Defendant replies that Plaintiff should not be allowed to voluntarily dismiss the claim and that it should be adjudicated on the merits.  We agree with Defendant and will grant Defendant summary judgment on this claim.

Pennsylvania recognizes a cause of action for wrongful discharge based on making a claim for worker's compensation.  *Dunsmuir v. May Department Stores Co.*, 120 F. App'x 927, 929 (3d Cir. 2005)(nonprecedential).  The federal courts analogize the claim to a Title VII retaliation claim.  *Id.*  The elements of the cause of action are the same as the ADA retaliation claim quoted above from *Krouse*.  As stated in *Dunsmuir*: "an employee must establish: (1) that he engaged in protected activity; (2) that he

---

[30]  We add that Plaintiff's evidence apparently shows that during the relevant time frame Plaintiff was insisting he was already entitled to a pain break rather than simply requesting one.

suffered an adverse employment action either after or contemporaneous with the protected activity; and (3) that there is a causal connection between his protected activity and the employer's adverse action.  120 F. App'x at 929.

As Defendant argues, the claim fails on the third element, which requires a causal connection between the protected activity and the employer's adverse action, because there is no evidence that any of the supervisors associated with the decision to fire Plaintiff knew he had made a worker's compensation claim.  The undisputed evidence shows that neither Lindsley, nor Morris, nor Schmidt knew that Velazquez had filed a workers' compensation claim.  (Doc. 32, DSMF ¶ 111).  Absent this knowledge there can be no causal connection.  *Dunsmuir*, 120 F. App'x at 929-30; *Moore v. City of Philadelphia*, 461 F.3d 331, 351 (3d Cir. 2006)("It is not reasonable for a factfinder to infer that an employer's reaction was motivated by an intent to retaliate for conduct of which the employer's decision maker was not aware.").

V.   *Conclusion*

We will issue an order granting Defendant summary judgment on all claims.


/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: November 4, 2015